IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| THE OFFICIAL STANFORD INVESTORS COMMITTEE, | § § § § § § § § § § § § § § § § | |
| Plaintiff, | | |
| v. | | Case No. 3:11-cv-00303-N |
| AMERICAN LEBANESE SYRIAN ASSOCIATED CHARITIES, INC., ST. JUDE CHILDREN'S RESEARCH HOSPITAL/ALSAC, ST. JUDE CHILDREN'S RESEARCH HOSPITAL and LE BONHEUR CHILDREN'S MEDICAL CENTER FOUNDATION, | | |
| Defendants. | | |

**FIRST AMENDED ORIGINAL COMPLAINT AGAINST
AMERICAN LEBANESE SYRIAN ASSOCIATED CHARITIES, INC.,
ST. JUDE CHILDREN'S RESEARCH HOSPITAL/ALSAC,
ST. JUDE CHILDREN'S RESEARCH HOSPITAL AND
LE BONHEUR CHILDREN'S MEDICAL CENTER FOUNDATION**

## SUMMARY

1. Revenue from the sale of fraudulent certificates of deposit ("CD Proceeds") generated substantially all of the income for the Stanford Defendants and the many related Stanford Entities (collectively, the "Stanford Parties") that were part of a massive Ponzi scheme orchestrated by the Stanford Parties.

2. The Official Stanford Investors Committee (the "Committee) has identified payments of CD Proceeds totaling at least $11,969,774.80 from the Stanford Parties to American Lebanese Syrian Associated Charities, Inc., St. Jude Children's Research Hospital/ALSAC and St. Jude Children's Research Hospital (collectively, the "ALSAC Defendants"). The Official Stanford Investors Committee (the "Committee) has also identified payments of CD Proceeds

1

totaling at least $1,500,000.00 to Le Bonheur Children's Medical Center Foundation ("Le Bonheur").

3. Through this lawsuit, the Committee[1] seeks the return of the CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur in order to return the funds to the Receivership Estate. The Committee's investigation is continuing, and should more payments of CD Proceeds to the ALSAC Defendants and/or Le Bonheur be discovered, the Committee will amend this Complaint to assert claims regarding such additional payments.

4. The ALSAC Defendants and Le Bonheur either performed no services for the CD Proceeds they received; performed services that did not constitute reasonably equivalent value in exchange for the CD Proceeds they received; or received CD Proceeds that were in furtherance of the Ponzi scheme, which cannot be reasonably equivalent value as a matter of law.

5. At all times relevant to this complaint, the Stanford Parties were insolvent, and Defendant R. Allen Stanford operated the Stanford entities in furtherance of his fraudulent scheme. Each payment of CD Proceeds from the Stanford Parties to the ALSAC Defendants and Le Bonheur was made with actual intent to hinder, delay, and defraud the Stanford Parties' creditors.

6. The Committee was only able to discover the fraudulent nature of the above-referenced transfers after R. Allen Stanford and his accomplices were removed from control of the Stanford entities and after reviewing documents relating to the Stanford Entities.

7. The Committee seeks an order that: (a) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur were fraudulent transfers under applicable

---

[1] The Court-appointed Receiver, Ralph S. Janvey, has assigned all of the Receivership's claims against the ALSAC Defendants and Le Bonheur to the Official Stanford Investors Committee. The Committee's claims in this Complaint are related to claims on file in Case No. 03:09-CV-0724-N before this Court. Pursuant to Local Rule 3.3(a), the Committee has filed a notice of related case concurrently with this Amended Complaint.

law or, in the alternative, unjustly enriched the ALSAC Defendants and Le Bonheur; (b) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the ALSAC Defendants and Le Bonheur are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

## JURISDICTION & VENUE

8. This Court has jurisdiction over this action, and venue is proper, under Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), Section 27 of the Exchange Act (15 U.S.C. § 78aa), and under Chapter 49 of Title 28, Judiciary and Judicial Procedure (28 U.S.C. § 754).

9. Within 10 days of the entry of the Order and Amended Orders Appointing Receiver, the Court-appointed Receiver filed the original SEC Complaint and the Order Appointing Receiver in the United States District Court for the districts in Texas and in the United States District Court for the Western District of Tennessee, pursuant to 28 U.S.C. § 754, giving this Court *in rem* and *in personam* jurisdiction in those districts and every other district where the Complaint and Order have been filed.

10. This Court has personal jurisdiction over the ALSAC Defendants and Le Bonheur pursuant to FED. R. CIV. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

11. Further, this Court has personal jurisdiction over American Lebanese Syrian Associated Charities, Inc., St. Jude Children's Research Hospital/ALSAC, St. Jude Children's Research Hospital and Le Bonheur Children's Medical Center Foundation because they maintain offices in Texas, regularly conduct business in Texas, and/or have engaged in continuous and systematic activities within Texas.

3

FIRST AMENDED ORIGINAL COMPLAINT AGAINST AMERICAN LEBANESE SYRIAN ASSOCIATED CHARITIES, INC., ST. JUDE CHILDREN'S RESEARCH HOSPITAL/ALSAC, ST. JUDE CHILDREN'S RESEARCH HOSPITAL AND LE BONHEUR CHILDREN'S MEDICAL CENTER FOUNDATION

## THE PARTIES

12.     Plaintiff Official Stanford Investors Committee was formed by this Court on August 10, 2010. *See* Case No. 3:09-CV-0298-N, Doc. 1149 (the "Committee Order)." As stated in the terms of the Committee Order, the Committee, through this Complaint, is prosecuting this action against the ALSAC Defendants and Le Bonheur for the benefit of the Receivership Estate and the Stanford Investors.

13.     American Lebanese Syrian Associated Charities, Inc.'s principal place of business is in Memphis, Tennessee. It also has offices in or continuous and systematic contacts with Texas. American Lebanese Syrian Associated Charities, Inc. will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

14.     St. Jude Children's Research Hospital/ALSAC's principal place of business is in Memphis, Tennessee. It also has offices in or continuous and systematic contacts with Texas. St. Jude Children's Research Hospital/ALSAC will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

15.     Defendant St. Jude Children's Research Hospital's principal place of business is in Memphis, Tennessee. It also has offices in or continuous and systematic contacts with Texas. St. Jude Children's Research Hospital will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

16.     Defendant Le Bonheur Children's Medical Center Foundation's principal place of business is in Memphis, Tennessee. It also has offices in or continuous and systematic contacts with Texas. Le Bonheur Children's Medical Center Foundation will be served pursuant to the Federal Rules of Civil Procedure or by other means approved by the Court.

4

FIRST AMENDED ORIGINAL COMPLAINT AGAINST AMERICAN LEBANESE SYRIAN ASSOCIATED CHARITIES, INC., ST. JUDE CHILDREN'S RESEARCH HOSPITAL/ALSAC, ST. JUDE CHILDREN'S RESEARCH HOSPITAL AND LE BONHEUR CHILDREN'S MEDICAL CENTER FOUNDATION

## STATEMENT OF FACTS

17. On February 16, 2009, the Securities and Exchange Commission commenced a lawsuit in this Court against R. Allen Stanford, two associates, James M. "Jim" Davis and Laura Pendergest-Holt, and three of Mr. Stanford's companies, Stanford International Bank, Ltd. ("SIB," "SIBL," or "the Bank"), Stanford Group Company, and Stanford Capital Management, LLC (collectively the "Stanford Defendants").

### I.   *Stanford Defendants Operated a Ponzi Scheme.*

18. As alleged by the SEC, the Stanford Defendants marketed fraudulent SIB CDs to investors through SGC financial advisors pursuant to a Regulation D private placement. SEC's Second Amended Complaint (Doc. 952), ¶ 27.[2] The CDs were sold by Stanford International Bank, Ltd. *Id.*

19. The Stanford Defendants orchestrated and operated a wide-ranging Ponzi scheme. Stanford Defendant James M. Davis has admitted that the Stanford fraud was a Ponzi scheme from the beginning. Doc. 771 (Davis Plea Agreement) at ¶ 17(n) (Stanford, Davis, and other conspirators created a "massive Ponzi scheme"); Doc. 807 (Davis Tr. of Rearraignment) at 16:16-17, 21:6-8, 21:15-17 (admitting the Stanford Ponzi fraud was a "massive Ponzi scheme ab initio"). In fact, this Court recently found that the Stanford fraud was indeed a Ponzi scheme. *See* Case No. 3:09-CV-0724-N, Doc. 456 at 2 ("The Stanford scheme operated as a classic Ponzi scheme, paying dividends to early investors with funds brought in from later investors."), at 11 ("[T]he Receiver presents ample evidence that the Stanford scheme . . . was a Ponzi scheme."), and at 13 ("The Court finds that the Stanford enterprise operated as a Ponzi scheme . . .").

---

[2] Unless otherwise stated, citations to Court records herein are from the case styled *SEC v. Stanford Int'l Bank, Ltd., et al.*, Civil Action No. 3-09-CV-0298-N.

5

FIRST AMENDED ORIGINAL COMPLAINT AGAINST AMERICAN LEBANESE SYRIAN ASSOCIATED CHARITIES, INC., ST. JUDE CHILDREN'S RESEARCH HOSPITAL/ALSAC, ST. JUDE CHILDREN'S RESEARCH HOSPITAL AND LE BONHEUR CHILDREN'S MEDICAL CENTER FOUNDATION

20. In an opinion filed on December 15, 2010, the Fifth Circuit upheld this Court's findings that the Stanford fraud was a Ponzi scheme. *See Janvey v. Alguire*, No. 10-10617, 2010 WL 5095506, at *1, *17 (5th Cir. Dec. 15, 2010) (upholding this Court's Order). In particular, the Fifth Circuit made several rulings on the nature of the Stanford fraud, as follows:

> We find that the district court did not err in finding that the Stanford enterprise operated as a Ponzi scheme.
>
> \* \* \*
>
> The Davis Plea and the Van Tassel Declarations provide sufficient evidence to support a conclusion that there is a substantial likelihood of success on the merits that the Stanford enterprise operated as a Ponzi scheme. . . . The Davis Plea, when read as a whole, provides sufficient evidence for the district court to assume that the Stanford enterprise constituted a Ponzi scheme *ab initio*.
>
> \* \* \*
>
> The Receiver carried his burden of proving that he is likely to succeed in his prima facie case by providing sufficient evidence that a Ponzi scheme existed . . .
>
> \* \* \*
>
> Here, the Receiver provided evidence of a massive Ponzi scheme . . . The record supports the fact that Stanford, when it entered receivership, was grossly undercapitalized.

*Id.* at *9-13.

21. In marketing, selling, and issuing CDs to investors, the Stanford Defendants repeatedly touted the CDs' safety and security and SIB's consistent, double-digit returns on its investment portfolio. SEC's Second Amended Complaint (Doc. 952), ¶¶ 32-33.

22. In its brochure, SIB told investors, under the heading "Depositor Security," that its investment philosophy is "anchored in time-proven conservative criteria, promoting stability in [the Bank's] certificate of deposit." SIB also emphasized that its "prudent approach and methodology translate into deposit security for our customers." *Id.* ¶ 34. Further, SIB stressed

6

the importance of investing in "marketable" securities, saying that "maintaining the highest degree of liquidity" was a "protective factor for our depositors." *Id.*

23. In its 2006 and 2007 Annual Reports, SIB told investors that the Bank's assets were invested in a "well-balanced global portfolio of marketable financial instruments, namely U.S. and international securities and fiduciary placements." *Id.* ¶ 35. More specifically, SIB represented that its 2007 portfolio allocation was 58.6% equity, 18.6% fixed income, 7.2% precious metals and 15.6% alternative investments. *Id.*

24. Consistent with its Annual Reports and brochures, SIB trained SGC financial advisors, in February 2008, that "liquidity/marketability of SIB's invested assets" was the "most important factor to provide security to SIB clients." *Id.* ¶ 36. In training materials, the Stanford Defendants also claimed that SIB had earned consistently high returns on its investment of deposits (ranging from 11.5% in 2005 to 16.5% in 1993). *Id.* ¶ 49.

25. Contrary to the Stanford Defendants' representations regarding the liquidity of SIB's portfolio, SIB did not invest in a "well-diversified portfolio of highly marketable securities." Instead, significant portions of the Bank's portfolio were misappropriated by the Stanford Defendants and were either placed in speculative investments (many of them illiquid, such as private equity deals), diverted to other Stanford Entities "on behalf of shareholder" – *i.e.*, for the benefit of Allen Stanford, or used to finance Allen Stanford's lavish lifestyle (*e.g.*, jet planes, a yacht, other pleasure craft, luxury cars, homes, travel, company credit cards, etc.). In fact, at year-end 2008, the largest segments of the Bank's portfolio were private equity; over-valued real estate; and at least $1.6 billion in undocumented "loans" to Defendant R. Allen Stanford. *See id.* ¶¶ 39-40.

26. In an effort to conceal their fraud and ensure that investors continued to purchase the CDs, the Stanford Defendants fabricated the performance of SIB's investment portfolio. *Id.* ¶ 4.

27. SIB's financial statements, including its investment income, were fictional. *Id.* ¶¶ 4, 53. In calculating SIB's investment income, Stanford Defendants R. Allen Stanford and James Davis provided to SIB's internal accountants a pre-determined return on investment for the Bank's portfolio. *Id.* Using this pre-determined number, SIB's accountants reverse-engineered the Bank's financial statements to reflect investment income that SIB did not actually earn. *Id.*

28. For a time, the Stanford Defendants were able to keep the fraud going by using funds from current sales of SIB CDs to make interest and redemption payments on pre-existing CDs. *See id.* ¶ 1. However, in late 2008 and early 2009, CD redemptions increased to the point that new CD sales were inadequate to cover redemptions and normal operating expenses. As the depletion of liquid assets accelerated, this fraudulent Ponzi scheme collapsed.

29. Most of the above facts discovered from Stanford's records have since been confirmed by Stanford's Chief Financial Officer, James Davis, who has pleaded guilty to his role in running the Stanford Ponzi scheme.

## II. *The Stanford Parties Transferred CD Proceeds from the Ponzi Scheme to the ALSAC Defendants and Le Bonheur.*

30. CD Proceeds from the Ponzi scheme described above were transferred by or at the direction of the Stanford Parties to the ALSAC Defendants and Le Bonheur. The ALSAC Defendants and Le Bonheur did not provide reasonably equivalent value for the transfers of CD Proceeds to them.

31. The Committee has identified payments of CD Proceeds totaling at least $11,969,774.80 from the Stanford Parties to the ALSAC Defendants and $1,500,000.00 to Le Bonheur.

32. The transfers of CD Proceeds to the ALSAC Defendants from the Stanford Parties consisted of at least the following: $2,067,000.00 in 2006; $3,908,100.00 in 2007; $5,959,500.00 in 2008; and $35,174.80 in 2009. Transfers of CD Proceeds to Le Bonheur from the Stanford Parties consisted of the following: $500,000 in 2005, $500,000 in 2006 and $500,000 in 2008. *See* App.[3] at 1 (listing the dates and amounts of payments to the ALSAC Defendants and Le Bonheur from the Stanford Parties). The Committee's investigation is continuing, and should more payments of CD Proceeds to the ALSAC Defendants and Le Bonheur be discovered, the Committee will amend this Complaint to assert claims regarding such additional payments.

## REQUESTED RELIEF

33. The Court appointed the Committee to represent Stanford investors in the case *SEC v. Stanford International Bank, Ltd., et al.*, Case No. 3:09-CV-0298-N and in related matters. Committee Order (Doc. 1149) at ¶ 2. The Committee Order, signed by the Court on August 10, 2010, states that "[t]he Committee shall have rights and responsibilities similar to those of a committee appointed to serve in a bankruptcy case under title 11 of the United States Code" and that the Committee may bring actions for the benefit of the Receivership Estate and the Stanford Investors. *See* Committee Order (Doc. 1149) at ¶¶ 2, 7-8. The Committee seeks the relief described herein in this capacity.

---

[3] The Appendix in Support of this Complaint is referred to herein as the "Appendix" or by the abbreviation "App." The Appendix is incorporated by reference into this Complaint.

***COUNT I:*** ***The Committee is Entitled to Disgorgement of CD Proceeds Fraudulently Transferred to the ALSAC Defendants and Le Bonheur.***

34. The Committee is entitled to disgorgement of the CD Proceeds transferred from the Stanford Parties to the ALSAC Defendants and Le Bonheur because such payments constitute fraudulent transfers under applicable law. The Stanford Parties made the payments to the ALSAC Defendants and Le Bonheur with actual intent to hinder, delay, or defraud Stanford's creditors; as a result, the Committee is entitled to the disgorgement of those payments. Additionally, the Stanford Parties transferred the funds to the ALSAC Defendants and Le Bonheur at a time when the Stanford Parties were insolvent, and the Stanford Parties did not receive reasonably equivalent value in exchange for the transfers.

35. The Committee may avoid transfers made with the actual intent to hinder, delay, or defraud creditors. "[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception." *Quilling v. Schonsky*, No. 07-10093, 2007 WL 2710703, at *2 (5th Cir. Sept. 18, 2007); *see also Alguire*, 2010 WL 5095506, at *9 ("[A] Ponzi scheme 'is, as a matter of law, insolvent from its inception.'"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) (". . . [the debtor] was a Ponzi scheme, which is, as a matter of law, insolvent from its inception. . . . [P]roof that [the debtor] operated as a Ponzi scheme established the fraudulent intent behind transfers made by [the debtor].").

36. The Stanford Parties were running a Ponzi scheme and paid the ALSAC Defendants and Le Bonheur with funds taken from unwitting SIB CD investors. The Committee is, therefore, entitled to disgorgement of the CD Proceeds the Stanford Parties fraudulently transferred to the ALSAC Defendants and Le Bonheur.

10

First Amended Original Complaint Against American Lebanese Syrian Associated Charities, Inc., St. Jude Children's Research Hospital/ALSAC, St. Jude Children's Research Hospital and Le Bonheur Children's Medical Center Foundation

37. As a charity, the ALSAC Defendants and Le Bonheur provided no value or reasonably equivalent value in exchange for the fraudulent transfers they received. Because the ALSAC Defendants and Le Bonheur cannot meet their burden to establish that they provided reasonably equivalent value for the payments of CD Proceeds to them, the Committee is entitled to the disgorgement of those funds.

38. Moreover, under applicable fraudulent-transfer law, the Committee is entitled to attorneys' fees and costs for its claims against the ALSAC Defendants and Le Bonheur. *See, e.g.,* TEX. BUS. & COM. CODE ANN. § 24.013 ("[T]he court may award costs and reasonable attorney's fees as are equitable and just."). As a result, the Committee requests reasonable attorneys' fees and costs for prosecuting its fraudulent-transfer claims against the ALSAC Defendants and Le Bonheur.

39. The ALSAC Defendants and Le Bonheur cannot meet their burden to establish that they provided reasonably equivalent value for the CD Proceeds they directly or indirectly received from the Stanford Parties. Accordingly, the Committee is entitled to the disgorgement of those funds.

40. In order to carry out its duties, the Committee seeks complete and exclusive control, possession, and custody of the CD Proceeds received by the ALSAC Defendants and Le Bonheur for the benefit of the Receivership Estate.

41. The Committee was only able to discover the fraudulent nature of the above-referenced transfers after R. Allen Stanford and his accomplices were removed from control of the Stanford entities and after reviewing documents relating to the Stanford entities. In fact, The Committee could not have been aware of any of the transactions involving CD Proceeds paid to the defendants until after its formation on August 10, 2010, at the earliest.

Thus, the discovery rule and equitable tolling principles apply to any applicable limitations period. *See, e.g., Wing v. Kendrick*, No. 08-CV-01002, 2009 WL 1362383, at *3 (D. Utah May 14, 2009); *Quilling v. Cristell*, No. 304CV252, 2006 WL 316981, at *6 (W.D.N.C. Feb. 29, 2006); *see also* TEX. BUS. & COMM. CODE ANN. § 24.010(a)(1) (claims may be brought either within four years of the transfer *or* "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant").

42. The Stanford Parties, who orchestrated the Ponzi scheme, transferred the CD Proceeds to the ALSAC Defendants and Le Bonheur with actual intent to hinder, delay, or defraud their creditors. The Committee is, therefore, entitled to disgorgement of all CD Proceeds fraudulently transferred to the ALSAC Defendants and Le Bonheur. Pursuant to the equity powers of this Court, the Committee seeks an order that: (a) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur were fraudulent transfers under applicable law; (b) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the ALSAC Defendants and Le Bonheur are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

> **COUNT II:** *In the Alternative, the Committee is Entitled to Disgorgement of CD Proceeds from the ALSAC Defendants and Le Bonheur under the Doctrine of Unjust Enrichment.*

43. In the alternative, the Committee is entitled to disgorgement of the CD Proceeds paid to the ALSAC Defendants and Le Bonheur pursuant to the doctrine of unjust enrichment under applicable law. The ALSAC Defendants and Le Bonheur received funds that belong to the Receivership Estate for ultimate distribution to the defrauded investors. The ALSAC Defendants and Le Bonheur have been unjustly enriched by their receipt of such stolen funds.

44. In order to carry out its duties, the Committee seeks complete and exclusive control, possession, and custody of the CD Proceeds received by the ALSAC Defendants and Le Bonheur for the benefit of the Receivership Estate.

45. The ALSAC Defendants and Le Bonheur have been unjustly enriched by their receipt of CD Proceeds from the Stanford Parties. The Committee is, therefore, entitled to disgorgement of all CD Proceeds the ALSAC Defendants and Le Bonheur received. Pursuant to the equity powers of this Court, the Committee seeks an order that: (a) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur unjustly enriched the ALSAC Defendants and Le Bonheur; (b) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur are property of the Receivership Estate held pursuant to a constructive trust for the benefit of the Receivership Estate; (c) the ALSAC Defendants and Le Bonheur are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received; and (d) awards attorneys' fees, costs, and interest to the Committee.

**PRAYER**

46. The Committee respectfully requests an Order providing that:

   (a) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur were fraudulent transfers under applicable law or, in the alternative, unjustly enriched the ALSAC Defendants and Le Bonheur;

   (b) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur are property of the Receivership Estate;

13

FIRST AMENDED ORIGINAL COMPLAINT AGAINST AMERICAN LEBANESE SYRIAN ASSOCIATED CHARITIES, INC., ST. JUDE CHILDREN'S RESEARCH HOSPITAL/ALSAC, ST. JUDE CHILDREN'S RESEARCH HOSPITAL AND LE BONHEUR CHILDREN'S MEDICAL CENTER FOUNDATION

(c) CD Proceeds received directly or indirectly by the ALSAC Defendants and Le Bonheur are subject to a constructive trust for the benefit of the Receivership Estate;

(d) the ALSAC Defendants and Le Bonheur are liable to the Committee for an amount equaling the amount of CD Proceeds they directly or indirectly received;

(e) The Committee is awarded attorneys' fees, costs, and prejudgment and post-judgment interest; and

(f) The Court grants such other and further relief as the Court deems proper under the circumstances.

Dated: April 14, 2011                    Respectfully submitted,

**STRASBURGER & PRICE, LLP**

By: /s/ Edward F. Valdespino
    Edward F. Valdespino
    Texas Bar No. 20424700
    Edward.valdespino@strasburger.com
    300 Convent St., Suite 900
    San Antonio, Texas 78205
    (210) 250-6061
    (210) 258-2703 (Facsimile)

ATTORNEYS FOR
THE OFFICIAL STANFORD INVESTORS COMMITTEE

**MORGENSTERN & BLUE, LLC**

    Peter D. Morgenstern (*admitted pro hac vice*)
    pmorgenstern@mfbnyc.com
    885 Third Avenue
    New York, New York 10022
    (212) 750-6776
    (212) 750-3128 (Facsimile)

ATTORNEYS FOR
THE OFFICIAL STANFORD INVESTORS COMMITTEE

**CASTILLO SNYDER, P.C.**

    Edward C. Snyder
    Texas Bar No. 00791699
    esnyder@casnlaw.com
    Bank of America Plaza, Suite 1020
    300 Convent Street
    San Antonio, Texas 78205
    (210) 630-4200
    (210) 630-4210 (Facsimile)

ATTORNEYS FOR
THE OFFICIAL STANFORD INVESTORS COMMITTEE

## CERTIFICATE OF SERVICE

On April 14, 2011, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that I will serve American Lebanese Syrian Associated Charities, Inc., St. Jude Children's Research Hospital/ALSAC, St. Jude Children's Research Hospital and Le Bonheur Children's Medical Center Foundation individually or through their counsel of record, electronically, or by other means authorized by the Court or the Federal Rules of Civil Procedure.

/s/ Edward F. Valdespino
Edward F. Valdespino

16

FIRST AMENDED ORIGINAL COMPLAINT AGAINST AMERICAN LEBANESE SYRIAN ASSOCIATED CHARITIES, INC., ST. JUDE CHILDREN'S RESEARCH HOSPITAL/ALSAC, ST. JUDE CHILDREN'S RESEARCH HOSPITAL AND LE BONHEUR CHILDREN'S MEDICAL CENTER FOUNDATION
512081.1/SPSA/23832/0101/041411